UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**LEXINGTON**

| | | |
|---|---|---|
| JERRY LEE ROBERTS, Deceased, | ) | |
| and The Estate of Jerry Lee | ) | |
| Roberts, | ) | Civil Action No. 5:04-01-JMH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| | ) | |
| WILLIAM L. CAISE, | ) | |
| | ) | |
| Defendant. | ) | |

**        **        **        **        **

This matter is before the Court on Defendant's renewed motion for summary judgment [Record No. 48]. Plaintiff responded [Record Nos. 47 & 49],[1] and the time for reply having passed, this matter is now ripe for review.

**FACTUAL BACKGROUND**

Plaintiff Jerry Lee Roberts was incarcerated on July 20, 2001 at the Federal Medical Center in Lexington, Kentucky, and was assigned to the Special Housing Unit ("SHU") in October of that year due to his suspected involvement in a fight. Plaintiff suffered from chronic asthma, for which he was prescribed the use

---

[1] Plaintiff filed a "Response to Defendant's Qualified Immunity Dismissal Motion" [Record No. 47] despite there being no such motion pending. After Defendant filed the instant motion [Record No. 48], Plaintiff filed a document labeled as a reply [Record No. 49]. The Court will construe these two filings by Plaintiff collectively as a response to the renewed motion for summary judgment, as both address the issues raised in the motion for summary judgment.

of a nebulizer "four times daily as needed."  Cells at SHU do not have electrical outlets, so Plaintiff had to ask a guard for an extension cord in order to run the nebulizer.  In addition to the nebulizer, Plaintiff also had non-electric inhalers available in his cell at all times.

Defendant William L. Caise, a correctional officer assigned to SHU at the time, has described the system used for keeping track of controlled equipment in SHU and provided excerpts from a BOP manual corroborating the existence of the procedures.  If an inmate needs access to certain items, including extension cords, a guard retrieves that equipment from a control room, and to do so the guard must exchange his "chit," a small metal disk with the guard's name on it, for the equipment.  The guard checking out the item is responsible for any loss or misuse of the equipment.  When the inmate is done with the equipment, the guard returns the item to the control room and retrieves his chit.  Plaintiff does not dispute that this accurately describes the proper procedure for controlling access to the extension cord, although Plaintiff does assert that other guards did not follow the system.

According to these procedures, Defendant always removed the extension cord from Plaintiff's cell at the end of his shift so as to be able to retrieve his chit. Plaintiff concurs, saying that Defendant always took away the extension cord between fifteen and thirty minutes before the end of his shift.

2

Plaintiff filed an administrative complaint against Defendant on December 11, 2002, protesting Defendant's practice of taking the cord when he began his shift (indicating that whoever was on duty in the shift prior to Defendant was not following the chit procedures).  Defendant addressed the complaint in an email to his supervisor, acknowledging that he took the cord.  After depositing his chit with the control room, Defendant at some point during his shift would return the cord to Plaintiff.  No further action was taken on the administrative complaint prior to Plaintiff's death.[2]

On December 13, 2002, Defendant worked a shift from 4:00 p.m. to midnight.  Sometime around 11:00 or 11:30 p.m., Defendant stopped by Plaintiff's cell and removed the cord.  Defendant claims that he made sure that Plaintiff was not using the nebulizer before removing the cord.  Plaintiff's cellmate, James Brummett, claims that Defendant did not ask whether Plaintiff was using it or not, and that Plaintiff asked to keep the cord.  Brummett does not claim

---

[2] Plaintiff also submits an unsigned affidavit of an unnamed inmate, taken in the course of a BOP investigation into Plaintiff's death, in which the unnamed inmate states that Plaintiff complained to Defendant about having his cord taken away on the day of December 13, 2002, sometime between 5:00 and 6:00 p.m.  An unsigned affidavit of an unknown person is not admissible, and Plaintiff has had over a year to conduct discovery and attempt to obtain the inmate's name. *See Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994) (holding that a district court had properly refused to consider a technically deficient affidavit on summary judgment). Even if the allegations contained in the affidavit were considered, however, they would not create any material issue of fact, as it is undisputed that Defendant gave Plaintiff the cord during his shift that day.

3

that Plaintiff actually was using the nebulizer.  Defendant went home when his shift ended at midnight.

There is no claim that Plaintiff was in any sort of physical distress when Defendant took the cord.  In fact, Plaintiff was well enough to stay up until 3:00 a.m. with his cellmate, Brummett, exercising and talking without experiencing any breathing problems.

At 5:00 a.m. on the morning of December 14, Brummett was awoken by the sound of Plaintiff struggling to breathe.  Plaintiff could not speak, and when Brummett asked him if he needed to use the nebulizer, Plaintiff shook his head yes.  Brummett yelled for a guard, and approximately ten minutes later guards arrived and began administering CPR to Plaintiff, who had stopped breathing. Efforts to revive Plaintiff were unsuccessful, and he was pronounced dead at 6:37 a.m.  The autopsy conducted by the Fayette County Coroner showed that Plaintiff died from acute cardiac dysrhythmia caused by constrictive atherosclerotic coronary artery disease, with bronchial asthma listed as a contributing cause.

Plaintiff has provided an affidavit from an asthma expert, Dr. I. Leonard Bernstein, stating that Plaintiff should have had his nebulizer available to him twenty-four hours a day, and that the inhalers that were in Plaintiff's cell at all times were no substitute for access to the nebulizer.

## PROCEDURAL BACKGROUND

On January 2, 2004 Plaintiff Jerry Lee Roberts, through his estate, filed this action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act, 28 U.S.C. § 1346, against the United States of America, the Bureau of Prisons ("BOP"), and William Caise in both his individual and official capacities, alleging violations of Roberts' Eighth Amendment right to be free from cruel and unusual punishment.

Defendants filed a motion to dismiss, or in the alternative, for summary judgment [Record No. 7]. The Court granted the motion to dismiss on the Federal Tort Claims Act count, as well as on the *Bivens* counts as to the United States, the BOP, and Caise in his official capacity, finding that Plaintiff's claims were barred under the doctrine of sovereign immunity [Record No. 18].

The Court denied the motion with respect to Caise in his individual capacity, finding that there were factual disputes bearing on whether Caise is entitled to qualified immunity. The Court allowed discovery to proceed only on the circumstances surrounding the taking of the extension cord on December 13, 2002, and whether Plaintiff's nebulizer was needed twenty-four hours a day.

The parties have conducted discovery in the time since the Court's order. On July 20, 2005 Plaintiff filed a document labeled

5

"Response to Defendant's Qualified Immunity Dismissal Motion" [Record No. 47], apparently in the mistaken impression that the Court's previous order had not completely disposed of that motion. The following week, Defendant Caise filed the instant motion, a renewed motion for summary judgment [Record No. 48], arguing that based on information obtained during discovery, Defendant is entitled to qualified immunity. Plaintiff filed a response [Record No. 49], and the matter is now ripe for review.

### APPLICABLE STANDARD OF REVIEW

Summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Federal Rule of Civil Procedure 56(c).  "Upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, particularly where there has been an opportunity for discovery."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (internal citations omitted).  In considering this motion, the Court must construe the facts in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The materiality of the various factual disputes will be addressed below.

**DISCUSSION**

**A.   Qualified Immunity**

Defendant's motion for summary judgment is based on qualified immunity.  In responding to such a motion, Plaintiff must pass two hurdles.  "First, the allegations must state a claim of violation of clearly established law.  Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts."  *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992) (internal citations and quotations omitted).  There is no dispute that Defendant removed the extension cord, so the Court need only address whether Plaintiff has stated a claim that Defendant violated clearly established law.

**B.   The Ministerial/Discretionary Distinction**

As a preliminary matter, however, it is necessary to address Plaintiff's argument that Defendant is not entitled to qualified immunity because his acts were purely ministerial.  Plaintiff cites two cases in support of the argument that qualified immunity only attaches to discretionary activities.  One of these cases, *Estate of Burks v. Ross*, 438 F.2d 230 (6th Cir. 1971), dealt not with qualified immunity but rather with absolute immunity under the doctrine of executive privilege, and thus is not particularly relevant.  *See id.* at 231.  In the second case, *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991), the Sixth Circuit held that a nurse

who had withheld prescribed medical care for five days from a prisoner who had been shot in the leg was not entitled to qualified immunity in a § 1983 action because following a doctor's prescription is a ministerial act for a nurse.[3]  *See id.* at 1156.

*Boretti* is not dispositive in this case both because it is an outlier, inconsistent with the Sixth Circuit's more recent qualified immunity jurisprudence, as well as being distinguishable from this case on the facts.  In the fourteen years since *Boretti* was decided, the Sixth Circuit has only once cited *Boretti* on the distinction between ministerial and discretionary functions for purposes of qualified immunity, and that was in an unpublished opinion twelve years ago.  *See Mawby v. Zent*, 1993 WL 498205 (6th Cir. Dec. 2, 1993).  Although the Sixth Circuit has never explicitly overruled *Boretti*, in the intervening years the Sixth Circuit has addressed qualified immunity defenses in many Eighth Amendment cases brought by prisoners without mentioning the ministerial/discretionary distinction.

Moreover, in many of those cases, the defendants' actions were no more discretionary than Caise's were in the instant action.  For example, in *Sanderfer v. Nichols*, 62 F.3d 151 (6th Cir. 1995), the estate of a man who had died from a heart attack in jail sued the

---

[3] Although this case is a *Bivens* action, and *Boretti*, as well as other cases cited herein, were § 1983 actions, the standard for qualified immunity is the same in both types of cases.  *See Vector Research, Inc. v. Howard & Howard Attorneys P.C.*, 76 F.3d 692 (6th Cir. 1996).

jail's clinical health specialist who had examined him.  The basis of the claim was that the defendant had not reviewed jail medical records indicating that the deceased suffered from high blood pressure and therefore had prescribed the wrong medicine.  *See id.* at 154.  The defendant's challenged action in *Sanderfer*, failing to look at available jail medical records when the prisoner was complaining of a health problem, was no more discretionary than Caise's actions.  The Sixth Circuit held that the clinical health specialist who had failed to check the medical records was entitled to qualified immunity without any discussion of whether his actions were ministerial or discretionary.[4]  *See id.* at 153-55.

In several other recent cases, the Sixth Circuit has found that defendants who failed to provide medical care to prisoners were not entitled to qualified immunity at the summary judgment stage, but the court did so *not* on the basis of the ministerial nature of the challenged activities, but rather on the grounds that the defendants were deliberately indifferent. *See, e.g.*, *Estate of Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005) (police officer knew prisoner was complaining of chest pains and shortness of breath, was told that she had not had her heart medicine, and prisoner died of heart attack); *Garretson v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005) (prisoner told booking

---

[4] The Court in *Sanderfer* cited and distinguished *Boretti* on the more general issue of whether the defendant's actions constituted deliberate indifference.  *See id*. at 154 n.5.

9

officers that she was an insulin-dependent diabetic, and she had to be hospitalized the next day after not receiving her insulin in jail); *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004) (prisoner with appendicitis vomited and complained of sharp abdominal pain for two days before receiving medical treatment). In other words, the Sixth Circuit went straight to the qualified immunity analysis without regard to the ministerial nature of the defendants' actions.

Other circuits have explicitly rejected the argument that the availability of qualified immunity rests on a distinction between ministerial and discretionary acts. *See, e.g.*, *Varrone v. Bilotti*, 123 F.3d 75, 82-83 (2d Cir. 1997); *Gagne v. City of Galveston*, 805 F.2d 558, 559-60 (5th Cir. 1986); *Jordan v. Doe*, 38 F.3d 1559, 1565-66 (11th Cir. 1994). As described by the Eleventh Circuit, courts that have applied the ministerial/discretionary distinction have done so based on a misreading of the Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). *See Jordan*, 38 F.3d at 1565. The Supreme Court in *Harlow* held that "government officials performing discretionary functions" are entitled to immunity so long as they do not violate clearly established rights. *See Harlow*, 457 U.S. at 818. An unduly narrow reading of *Harlow* only allows for immunity for nonministerial functions. A better reading, according to recent case law from other circuits, interprets the "discretionary functions" language from *Harlow* as

10

meaning simply that the government officials must be acting within the scope of their discretion, *i.e.*, within the scope of their authority. *See Jordan*, 38 F.3d at 1566; *see also Putnam v. Davies*, 169 F.R.D. 89, 96 (S.D. Ohio 1996) (holding that an official's ministerial acts are protected by qualified immunity so long as they "(1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority") (internal citations and quotations omitted). Language from recent decisions indicates that the Sixth Circuit follows the latter reading of *Harlow*: "Qualified immunity protects government officials from civil liability for actions taken within their official discretion." *Jarriett v. Wilson*, 414 F.3d 634, 642 (6th Cir. 2005); *see also Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) ("The defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question.").

The Second Circuit has specifically addressed the problems associated with denying a defendant like Caise qualified immunity. In *Varrone v. Bilotti*, a prisoner complained about unconstitutional strip searches, and after the Second Circuit had decided that the supervisors who ordered the searches were immune, it turned to the officers who had actually conducted them. *See Varrone*, 123 F.3d at 82. The court held that "even if these two subordinate officers performed solely a ministerial function in conducting the strip

search, they still have qualified immunity for carrying out the order, not facially invalid, issued by a superior officer who is protected by qualified immunity. . . . It would be anomalous to provide qualified immunity to the higher ranking officers who ordered the strip search, but to deny it to the subordinates who carried out the order." *Id.* Similarly, it would be anomalous to hold Caise personally liable for removing the extension cord, when he was required to do so by BOP procedures.

In addition to the questionable status of *Boretti* in light of more recent Sixth Circuit case law and the persuasive authority from other circuits, differences between the facts of the instant case and *Boretti* lead to a different result. In *Boretti*, the defendant nurse *knew* what the plaintiff's prescription called for, and it was the defendant's *duty* to administer the prescribed medication and change the dressings on the plaintiff's wounds, a duty which she breached. *See Boretti*, 930 F.3d at 1156. In contrast, even according to Plaintiff, Caise knew nothing of Roberts' prescription except that he needed an extension cord at times. Caise was not a member of the medical staff, and his duty was to guard the prisoners, not to administer prescribed medication. A policy was implemented at SHU to control items like extension cords, and Caise followed that policy. Like the guards following orders to conduct strip searches in *Varrone*, Caise should not be denied qualified immunity merely because he was following

12

established procedure, and therefore it is necessary to apply the test for qualified immunity.

## C.    The Existence of a Constitutional Violation

To overcome a claim of qualified immunity, Plaintiff has the burden "to prove that the officer violated a right so clearly established that any reasonable official in [his] position would have understood it was unlawful to engage in the conduct that violated the right."  *Jarriett*, 414 F.3d at 642; *see also Garretson*, 407 F.3d at 798 ("[Plaintiff] bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity.").  "There are two steps in the analysis: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."[5]  *Carter*, 408 F.3d at 310-11.

Plaintiff correctly points out that a denial of medical care to an inmate in some circumstances can constitute an Eighth Amendment violation:

> Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  This is true whether

---

[5] The Sixth Circuit in *Carter* noted that this test is sometimes phrased as a three-part inquiry, with the objective reasonableness of the officer's actions as a separate prong, but the court in *Carter* also noted that the tests are functionally identical, and both are in compliance with Supreme Court and Sixth Circuit precedent.  *See Carter*, 408 F.3d at 310 n.2.

> the indifference is manifested by prison
> doctors in their response to prisoner's needs
> or by prison guards in intentionally denying
> or delaying access to medical care or
> intentionally interfering with the treatment
> once prescribed.

*Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976) (internal citations
and quotations omitted).

"In order to state an Eighth Amendment claim in a medical
mistreatment case . . . a prisoner must show unnecessary suffering
brought about by the deliberate indifference of prison medical
staff to his needs." *Thaddeus-X v. Blatter*, 175 F.3d 378, 401 (6th
Cir. 1999) (en banc). The claim must have both an objective and a
subjective component. "For the objective component, the detainee
must demonstrate the existence of a sufficiently serious medical
need." *Carter*, 408 F.3d at 311. A medical need is sufficiently
serious if it would be obvious even to a lay person that there was
a necessity for medical care. *See Blackmore*, 390 F.3d at 896-99
(detailing the history of the Sixth Circuit's decisions on the
objective component of Eighth Amendment claims). Plaintiff has at
least raised an issue of fact as to whether his condition was
sufficiently serious, both by the submission of an affidavit from
a physician specializing in asthma, and by the very fact that
Plaintiff died in part because of his asthma.[6] However, Plaintiff

---

[6] It may well be the case that at trial this issue would be
resolved in favor of Defendant. Plaintiff's expert, an asthma
specialist, may have a poor frame of reference for deciding what
would be obvious to a lay person. Furthermore, even if it was

14

cannot meet the subjective prong of the test for an Eighth Amendment violation.

To meet the subjective standard, "the prison officials must have acted with a sufficiently culpable state of mind." *Jarriett*, 414 F.3d at 643 (internal quotations omitted). The standard for culpability is deliberate indifference, which, as defined by the Sixth Circuit is "a subjective type of deliberate indifference, akin to criminal recklessness: Was *this individual prison official* aware of the risk to the inmate's health and deliberately indifferent to it?" *Thaddeus-X*, 175 F.3d at 402 (emphasis in original).

This standard is far higher than mere negligence. As the Sixth Circuit recently stated, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is

_____

obvious that Plaintiff had this condition, it may not have been obvious to Defendant that Plaintiff required the extension cord twenty-four hours a day. Recent Sixth Circuit cases finding obvious medical conditions have generally addressed more acute conditions such as heart attacks, *see Carter*, 408 F.3d at 305, and appendicitis, *see Blackmore*, 390 F.3d at 890, in which the need to provide medical care would seem more obvious than the need to provide an extension cord at all times to a prisoner who only used it three or four times per day. However, for purposes of this motion, Plaintiff's allegations will be read in the light most favorable to him, and therefore the Court will assume that the objective prong has been met.

essential to a finding of deliberate indifference." *Blackmore*, 390 F.3d at 896 (internal citations and quotations omitted); *see also Sanderfer*, 62 F.3d at 155 ("[D]eliberate indifference . . . requires a subjective showing that the defendant was aware of the risk of harm.").[7]

Thus it is not sufficient for Plaintiff to show that Defendant acted negligently, or even that Defendant should have known of an obvious risk and did nothing.  A verdict in favor of Plaintiff would require a jury to find that Defendant *actually knew* of a substantial risk caused by removing the extension cord at the shift change.  Plaintiff has offered no evidence even suggesting that Defendant had such knowledge.  In fact, Plaintiff implicitly concedes the point by relying on Defendant's deposition testimony in which he stated that he did not know what Plaintiff's prescription was and did not make any efforts to find out. Plaintiff offers Defendant's testimony on this matter to show that Defendant did not take reasonable steps to ascertain Plaintiff's medical needs, which might be persuasive if the standard were negligence.  However, since the applicable standard is actual

---

[7] Plaintiff cites *Farmer v. Brennan*, 511 U.S. 825 (1994), for the proposition that he need not prove that Defendant actually knew that harm would befall him, and that Defendant's knowledge can be proved by circumstantial evidence.  However, Plaintiff ignores that *Farmer* still requires proof of "knowledge of a substantial risk of serious harm."  *Id.* at 842.  For the same reason, Plaintiff's reliance on *Comstock v. McCrary*, 200 Fed. App. 0421P (6th Cir. 2001), is unpersuasive.

knowledge, Defendant's lack of knowledge, as described by Plaintiff, is a valid defense.[8]

The other facts on which Plaintiff relies do not offer a basis on which a reasonable jury could find the existence of a constitutional violation, and therefore they are immaterial. Plaintiff provides an email that Defendant wrote to his supervisor after Plaintiff complained about the removal of the cord, and Plaintiff could argue that Defendant knew of Plaintiff's need for the cord. However, all that the email shows is that Defendant knew that Plaintiff was complaining about having the cord taken away at the beginning of Defendant's shift; there remains a large inferential leap from knowing that Plaintiff had complained about the cord being removed at the beginning of Defendant's shift to knowing of a substantial risk created by the removal during the shift change. It is not enough to show that a prison guard *should have* drawn an inference that there was a substantial risk; Plaintiff must demonstrate that Defendant *actually drew* the inference. *See Blackmore*, 390 F.3d at 896. The email does nothing

---

[8] Moreover, even if Defendant actually had known of the risks involved with removing the extension cord, he might still be protected by qualified immunity. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Sanderfer*, 62 F.3d at 155 (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). The Court need not reach the question of whether Defendant responded reasonably to Plaintiff's medical needs, as the Court finds no indication that Defendant knew that removing the cord created a health risk in the first place.

to demonstrate Defendant's knowledge of a substantial risk.

Similarly, Plaintiff emphasizes the dispute about whether Defendant said anything when he removed the cord on the night in question.    Plaintiff's cellmate asserts that Defendant said nothing.  Defendant claims that he checked whether Plaintiff was using the extension cord before he removed it.  This dispute has no bearing on what Defendant knew about the health risks, and moreover, even if Defendant said nothing, Plaintiff has not provided any explanation of how this would be material.  Neither Plaintiff nor his roommate has claimed that Plaintiff was actually using the nebulizer at the time, and several hours elapsed from the time Defendant went home to the time Plaintiff began to have trouble breathing, hours in which Plaintiff could have asked another guard for the extension cord.

Plaintiff also points to the other guards' practice of leaving the cord in the cell at all times and claims that this raises a disputed issue of material fact, although he fails to describe how he believes it is material.   This dispute, however, is not material.[9]  Plaintiff has not provided any evidence that rebuts Defendant's claim, corroborated by a BOP manual specifically directing prisons to develop systems for controlling inmate access to extension cords, that it was proper procedure for him to account

_____

[9] In fact, it may not even be a dispute.  There is nothing in the record from Defendant commenting on other guards' practices.

18

for the cord using the chit system and remove the cord at the end of his shift.  That other guards failed to follow the chit procedures does nothing to demonstrate anything about Defendant's subjective knowledge of Plaintiff's medical needs, or his indifference to them.

In fact, Plaintiff's vociferous assertions that other guards were more accommodating with the extension cord demonstrates why another of what Plaintiff calls disputed issues of material facts is actually immaterial.  Defendant has raised the issue of whether Plaintiff could have obtained the cord from another guard sometime between when Defendant removed it and when Plaintiff died approximately six hours later.  Plaintiff claims that he could not have obtained the cord from a guard because he could not speak while he was suffering the attack, and thus that there is an issue of material fact whether Plaintiff could have obtained the cord. Plaintiff's argument on this point ignores the several hours in which, by his own evidence, Plaintiff and his cellmate stayed up talking and exercising.  Plaintiff offers no explanation why he could not have obtained the cord during that time.  If, as Plaintiff and Defendant, agree, Defendant took the cord away every night, somebody must have brought the cord back to him after every one of Defendant's shifts, presumably a guard who brought the cord at Plaintiff's request.  Moreover, as with the other facts on which Plaintiff relies, resolving this issue of fact in favor of

19

Plaintiff would not demonstrate that Defendant knew of a substantial risk or acted with deliberate indifference.

Plaintiff also makes much of his expert's claims that Plaintiff should have had access to his nebulizer at all times, and that the non-electric inhalers were no substitute. Even assuming that this is true, it would not establish a constitutional violation. A difference in opinion as to medical treatment does not give rise to a constitutional violation. Medical malpractice or even incompetence on the part of prison officials is not deliberate indifference. *See Johnson v. Karnes*, 398 F.3d 868, 875 (6th Cir. 2005). A prison official must *know* of a substantial risk and disregard it. *See id.* The expert's opinions do not demonstrate that Defendant knew of the risk, and therefore they do not raise an issue of material fact.

**D. Clearly Established Law at the Time of Plaintiff's Death**

As Plaintiff has not met his first burden to overcome a defense of qualified immunity by alleging a constitutional violation, the Court need not address the second prong of the qualified immunity test, whether Defendant's conduct violated a clearly established right. However, even if Defendant's conduct had violated a constitutional right, Plaintiff has not cited any cases with factual scenarios that are even remotely similar to the conduct at issue in this case.

To demonstrate that the right alleged to have been violated

20

was clearly established at the time, Plaintiff cites cases in which a defendant has denied medical care to a prisoner, or interfered with a prescription.  This is insufficient to show that Defendant's violation, if there was one, was clearly established.  "[T]he operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant legal rule is to be identified."  *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (1992) (internal quotations omitted).  Plaintiff's statement of the operable rule – that denial of medical care or interference with a prescription is a constitutional violation – is too general.  The "salient question" is whether the state of the law at the time of the incident gives defendants "fair warning that their alleged treatment . . . [of prisoners] was unconstitutional."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Plaintiff has cited no cases, and the Court finds no cases within the Sixth Circuit, in which a prison guard who did not know of a prisoner's prescription has been held liable for a constitutional violation as a result of properly following prison procedures.  Therefore, even if Plaintiff's claim had stated an Eighth Amendment violation, Defendant would still be entitled to immunity.

## CONCLUSION

Accordingly, and for the foregoing reasons, **IT IS ORDERED:**

(1)  That Defendant's renewed motion for summary judgment [Record No. 48] be, and the same hereby is, **GRANTED.**

    (2) That Plaintiff's remaining claims be, and the same hereby are, **DISMISSED WITH PREJUDICE.**

    This the 3rd day of October, 2005.



**Signed By:**

**_Joseph M. Hood_**

**United States District Judge**